People v Flynn (2004 NY Slip Op 50001(U))

[*1]

People v Flynn

2004 NY Slip Op 50001(U)

Decided on January 5, 2004

Supreme Court, Bronx County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 5, 2004

Supreme Court, Bronx County
 
 THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff,
against
MICHAEL FLYNN, Defendant.
Ind. No. 971-03

Richard Lee Price, J.
On February 20, 2003 the Defendant was indicted for various degrees of Criminal possession of a controlled substance and other charges related to his arrest on September 28, 2002, including Bribery in the third degree, P.L. § 200.00. The case came into this part on December 8, 2003 for a combined Mapp, Huntley and Dunaway statement hearing. That hearing concluded on December 10, 2003 and, after oral argument, the People submitted a written memorandum in further support of their opposition to suppression of the physical evidence and certain statements allegedly made by the defendant.
Thereafter, as briefly stated on the record, I denied the Mapp application to suppress the drugs and knife recovered from the Defendant and I partially granted the Huntley and Dunaway motions to the extent of suppressing the statement surreptitiously recorded at the precinct, but I denied suppression of two statements Mr. Flynn allegedly made to a police sergeant while being transported back to the precinct. This Decision amends that determination and sets forth my reasons.
The Hearing Evidence
The only witness at the hearing was Sergeant Louis Graziano, and the following findings of fact are made from his testimony and the evidence introduced in support thereof.
Sergeant Graziano testified that at about 10:15 on the evening of September 28, 2002, he and his partner were on motor patrol in plain clothes pursuant to their grand larceny auto, anti-crime assignment. The officers pulled up and double parked their unmarked vehicle in the area of 138th Street and Waldo Avenue, two blocks away from Manhattan College. Sgt. Graziano described the area as "busy with pedestrian traffic. It's frequented by there is a dorm across the street for the college. There is a lot of activity in the street. Drinking on the street. Sometimes drug transactions take place in that general area. Things of that nature." H. 5-6. However, on cross-examination, the Sgt. also testified that there are a number of bars and stores in the area, and that it was specifically not his testimony that this was a "high drug location." H. 42-43.
Sgt. Graziano stated that he and Officer Cullen observed a group of some eight to ten individuals standing around. The defendant was in the middle of this group and the sergeant "didn't know who he was at first. We decided to stand, to park the car, double park the car and [*2]see if anything was going on. My partner, Officer Peter Cullen noticed that * * * he stated that he knew the defendant . . . from a prior arrest." H. 7-8. The defendant "was surrounded by * * * what appeared to me to be college students, relatively well dressed, well groomed people. He was in the middle of that mass of people and he appeared to be a little disheveled. And originally, we thought that he was a neighborhood kid that was being accosted by a college kid. We thought there was going to be a dispute at that location. * * * As he was engaging in conversation with the people that were standing around him, he was slowly turning around that crowd, and I noticed him, what appeared to me, noticed the vehicle that we were in, noticed I noticed the defendant see the car. He had a look of surprise on his face. He dropped the item in his hand and pushed it over with his feet." H. 9-10. "I observed the defendant with a brown, I'm sorry, a plastic bag in his hand, turn around and noticed the Police car parked there. At that point, the defendant looked startled, like he was kind of shocked that there was an unmarked Police car sitting there. He dropped the bag, and out of his left hand. He tried to scoot it over behind a cement pillar with his left foot." H. 8.
On cross-examination the sergeant admitted that they saw no exchanges between the defendant and any of the other ten to twelve people he was standing with, he "just saw conversation", H. 46, "[t]hey were milling around Mr. Flynn, talking among themselves, standing around Mr. Flynn." H. 62. Nor did he find anything suspicious about the plastic bag the defendant dropped, and he had no idea what was in it. "It's a black bag that you get from, like, a corner grocery store, like a shopping bag, black plastic shopping bag." H. 47.
The sergeant asked his partner to call to the defendant and ask him to come (the two car-lengths) over, which he did. As the defendant approached, both officers got out to meet him, with Cullen questioning him on what he was "doing here, what's going on, and that kind of thing. I asked Mr. Flynn if that was his bag that he had dropped, and he stated to me, No. I asked Mr. Flynn if he dropped the bag and he said no. I looked into the bag. I noticed that there was some narcotics in the bag. A scale, some drug paraphernalia, some glassine envelopes and I retrieved the bag and brought it back to the vehicle." H. 11.
The defendant was immediately arrested and handcuffed. Graziano testified that as he was leading him back to the back of the patrol car, Mr. Flynn "stated to me that he would give me half his money if I could let him go." H. 13. Telling the Defendant to relax, he put him in the vehicle and they drove back to the precinct. On the way, Flynn is alleged to have again spoken up, saying "he was afraid that [if] he wasn't let out with his drugs, that he was going to be killed. As a matter of fact, the statement was, I'm going to get bopped if I don't have my drugs. If I don't get my drugs back. He offered me all of his currency." H.113-14.
At the precinct, the defendant was put into a holding cell while the officer notified the Internal Affairs office about the bribe offer. The Bronx Investigation Unit of that office put a tape recording device on the sergeant and the defendant was brought into the "juvenile room" where they could speak without any background noise. Sgt. Graziano reinterviewed Flynn, and called in two other officers as witnesses, explaining to the defendant that these officers had to be clear that they were going to get "a fair share of the money." H. 20. The defendant again explained that he wanted to give up the money so he could be released with the drugs because "[h]e was afraid that he was going to be killed if he didn't get his drugs back. He offered us the money to let him go." Id.
[*3]
After this conversation, the defendant was taken back to the holding cell and the officers checked to verify that the recording was intelligible. Confirming that it was, the officers returned to the defendant and arrested him for bribery. Only then was he given his Miranda warnings. Mr. Flynn immediately asked for an attorney and questioning ceased. The defendant was then processed for arrest, i.e., he was fingerprinted, his property and the seized evidence was vouchered, and the drugs were field-tested.
Discussion
A. Mapp Motion To Suppress Physical Evidence
The initial testimony of Sgt. Graziano was plain the officers had no credible reason for singling the Defendant out except for Officer Cullen's prior encounter with him, an arrest allegedly for a simple marijuana possession violation which never resulted in a conviction; in fact, the charge was later dismissed. The sergeant was also clear that the Defendant made no suspicious movements, there was no physical exchange of any kind between him and the people he was talking with, and his holding an ordinary shopping sack from a bodega was not in any way cause for suspicion. Moreover, the officers had no information that criminal or other suspicious activity was going on in that area that night, and certainly no information to give them a reason to look for the Defendant. And finally, while the sergeant later changed his testimony on re-cross, his statement on examination by defense counsel was that the prior arrest played no part in the stop of the Defendant. Moreover, in the grand jury the sergeant had testified that the Defendant did not drop the bag until being called over by Officer Cullen.
In People v. DeBour, 40 N.Y.2d 210 (1976), the Court of Appeals set forth guidelines for courts in assessing four different levels of police intrusions, each justified by the knowledge possessed by officers when making the intrusion. The most basic, least intrusive level permits an officer to approach a citizen to request simple information when there is some objective, credible reason for that interference, even if not indicative of criminal behavior. Id., 40 N.Y.2d at 223. As the Court noted, "any time an intrusion on the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or an idle curiosity, the Spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule . . .." Id. at 217.
I find that the officers' singling the Defendant out and questioning him was without substantial basis sufficient to rise to even a "level 1" stop. The testimony that the Defendant looked noticeably different from the other young men on the street that night, in an area of bars and bodegas, two blocks from Manhattan College, and holding a plastic grocery bag, does not support an inference of suspicious behavior. Being somewhat familiar with colleges, I find the asserted "disheveled" appearance of the Defendant as somehow setting him apart from the other young men is not a sufficient reason nor even worthy of belief. Further, I find that the testifying officer's "reformation" of his testimony, regarding whether his partner's prior dealings with the Defendant formed any part of the basis for the intrusion into the Defendant's privacy, effectively dispelled the officer's credibility on this point.
However, I find that under either version set forth through the sergeant's testimony, the initial interference with the Defendant's privacy was unjustified. If the prior marijuana arrest played no part in causing the inquiry, there was certainly no objective credible reason to call him over to the police car. And if, as defense counsel urges, the prior arrest and the officers' [*4]disgruntlement over the subsequent dismissal of those charges on a technicality was the motivating factor, the intrusion was a conscious effort to harass the Defendant, no more valid than a random fishing expedition. In either case, there was no observed conduct supporting an individualized suspicion of the Defendant warranting any police intrusion into his privacy. As the Supreme Court of the United States made explicit more than seventy-five years ago, "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light." Byars v. United States, 273 U.S. 28, 30 (1927) (per Sutherland, J.). See also United States v. Di Re, 332 U.S. 581, 595 (1948) ("a search is not to be made legal by what it turns up").
Accordingly, had the officers proceeded to search the Defendant at that point, I would suppress any evidence recovered from his person. Cf. Florida v. J.L., 529 U.S. 266 (2000) (invalid Terry stop required suppression of firearm disclosed by frisk); People v. Hogencamp, 295 A.D.2d 808 (3rd Dept. 2002) (even if initial stop justified, subsequent detention was not; suppression granted). Nonetheless, the People argue that on constraint of People v. Ramirez-Portoreal, 88 N.Y.2d 99 (1996) and its progeny, I must deny suppression of the items contained in the black plastic bag because those cases compel me to find that the Defendant abandoned the bag when he tossed it down and then disavowed an ownership interest in it.
Initially, while uneasy with it, I came to the same conclusion and, as previously noted in a brief statement on the record, I denied suppression, albeit reluctantly. However, upon further research and reflection, I conclude that I was in error and accordingly, my previous determination is withdrawn and the Defendant's motion to suppress all physical evidence is granted.
In Ramirez-Portoreal, supra, one of the three defendants was observed retrieving a paper bag from one of several boxes in a trash pile, withdrawing objects from that bag, and then placing the bag back into the box, which he left in the garbage. A second defendant was seen placing an item in a vehicle tailpipe. A third defendant was arrested on a bus, after his luggage, placed on the overhead rack, was searched and found to contain dime bags of heroin. The Court of Appeals held that neither of the first two defendants had any expectation of privacy in the place or item searched and they did not seek to preserve any privacy. However, in the third situation just described, the Court of Appeals found a sufficient expression of an expectation of privacy by the defendant, even though he denied ownership when questioned, and the Court remanded the case for a determination of the legality of the police conduct.
Thus, a more careful reading of this case, and subsequent case law, has convinced me that the same analysis the Court of Appeals applied to the luggage on the bus is appropriate here. For example, in People v. Rodriguez, 281 A.D.2d 565 (2nd Dept. 2001), the Appellate Division held that because the stop of the vehicle in which that defendant was a passenger was not based upon reasonable suspicion, "the handgun seized as a result of the stop . . . cannot be deemed to have been abandoned . . .." People v. Rodriguez, supra, 281 A.D.2d at 566 (citing Ramirez-Portoreal and People v. Williams, 154 A.D.2d 564). In a unanimous opinion, the Court of Appeals fully agreed with this conclusion, specifically noting that "there is evidence in the record to support the Appellate Division's determination that the gun cannot be deemed to have been abandoned." People v. William II, 98 N.Y.2d 93, 100 (2002) (citing People v. Ramirez-Portoreal, among other cases). Again, I find that logic compelling here, and it requires suppression of the physical evidence.
B. Huntley/Dunaway Motion To Suppress Statements
[*5]
I find that the Defendant's statement or statements to Sgt. Graziano in the unmarked patrol car, while he was being transported back to the precinct, were volunteered by the Defendant, and constituted independent, contemporaneous crimes in their own right, and need not be suppressed. As the late Judge Nickerson observed, in United States v. Persico, 520 F.Supp. 96 (S.D.N.Y. 1981), "Although failure to give Miranda warnings may require the exclusion of subsequent statements in a prosecution for crimes already committed, that failure does not make inadmissible statements which are themselves crimes." Id. at 100. See also People v. Middleton, 54 N.Y.2d 474 (1981), where our Court of Appeals has similarly held.
However, because the Defendant was already under arrest, but never given Miranda warnings, and because, by the time they had arrived at the precinct the police had sufficient probable cause to arrest the Defendant for this further crime of offering a bribe, the subsequently staged and taped conversation with the Defendant, obtained prior to the administration of Miranda warnings, must be suppressed. While the People argue that Middleton also supports the admission of the taped conversation, I do not read the case law to extend that far.
The issue in Middleton was specifically "reduced to the extent to which defendant's prior request for an attorney limited the investigation that would normally be made by a police officer to whom a bribe offer has been made." People v. Middleton supra, 54 N.Y.2d at 479. The obvious distinction here is that Mr. Flynn was never advised of his right to remain silent and to have the assistance of counsel and, therefore, he could not be said to have waived those rights by initiating a new crime. As the Court of Appeals observed in Middleton, the Fifth and Sixth Amendment guarantees, which the Miranda rule was fashioned to protect, "recognize an accused person's view 'that without legal advice he is not competent to deal with those in whose custody he is' (People v. Kazmarick, 52 N.Y.2d 322; People v. Cunningham, 49 N.Y.2d 203), to minimize the disadvantage of a person accused by mitigating the coercive influence of the state and to further fundamental fairness." People v. Middleton, supra, 54 N.Y.2d at 481 (internal citations omitted). Here, Mr. Flynn was given no such opportunity to stand mute and confer with an attorney, and there is no reason why he was not immediately given Miranda warnings upon his production at the station house except the officer's desire to 'gild the lily'.
The officers should have given the Defendant Miranda warnings before questioning him. Merely because the bribe offer came immediately after the arrest for drug possession and constituted a new, independent crime did not justify foregoing this essential safeguard which the Constitution requires. Indeed, the taped conversation may well have been meant to also elicit the motive for the drug possession, with an eye towards enhancing the intent-to-sell element of the possessory crimes. But whether it was or not, the bribe offer was inextricably intertwined with the drug possession charges. Given that the Defendant had already been arrested for this and the police possessed more than sufficient probable cause to support the bribery charge as well, the custodial interrogation here, in the absence of Miranda warnings, was improper. "It is well established that the prosecution is barred from using statements made during the custodial interrogation of a defendant if Miranda warnings are not properly administered." United States v. Santiago, 174 F.Supp. 16, 23 (S.D.N.Y. 2001) (Marrero, U.S.D.J.). Compare Hoffa v. United States, 385 U.S. 293 (1966) (Miranda not required where defendant not yet in custody and probable cause not established).
This constitutes the Decision and Order or the Court.
[*6]
Dated: Bronx, New York
January 5, 2004
E N T E R
Richard Lee Price, J.S.C.
Decision Date: January 05, 2004